IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **JERRY ANTHONY CALL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12CV00027 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING** | ) | By: James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | United States District Judge |
| **SECURITY,**[1] | ) | |
| | ) | |
| Defendant. | ) | |

*Vernon M. Williams, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Anne von Scheven, Assistant Regional Counsel, and Stephen M. Ball, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the decision of the Commissioner.

I

Plaintiff Jerry Anthony Call filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits and supplemental security income pursuant to Titles II

---

[1] Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit pursuant to Fed. R. Civil P. 25(d).

and XVI, respectively, of the Social Security Act (the "Act"), 42 U.S.C.A. §§ 401-34 (West 2011 & Supp. 2013), 1381-83f (West 2012 & Supp. 2013). Jurisdiction of this court exists under 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Call protectively applied for benefits on December 4, 2007, alleging disability beginning November 30, 2007. His claim was denied initially and upon reconsideration. A hearing was held before an administrative law judge ("ALJ") on June 9, 2010, but it was continued so that Call could undergo a psychological evaluation. A subsequent hearing was held on October 13, 2010, at which Call, represented by counsel, and a vocational expert ("VE") testified. The ALJ issued a decision on October 25, 2010, in which he found that Call had the residual functional capacity ("RFC") to perform a range of light work, including several jobs that existed in significant numbers in the national economy, and thus was not disabled. Call requested review by the Social Security Administration's Appeals Council, which denied his request for review, thereby making the ALJ's decision the final decision of the Commissioner. Call then filed the Complaint in this court seeking judicial review of the Commissioner's decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is now ripe for decision.

II

Call alleged disability due to fibromyalgia, degenerative disc disease, depression, and gastroesophageal reflux disease. He was 42 years old on the date his application was filed, making him a younger individual under the regulations. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c) (2013). Call finished the seventh grade and had past relevant work as a material handler and welder helper.

At the hearing, Call testified that he had not worked since 2006 due to disabling pain. The record contains several references that contradict this assertion, however. In 2006, Call told a social worker that he had stopped working because his employer retired. The record reflects that in April 2007, Call was working as a vinyl siding and aluminum gutter contractor, and in March 2009, he was doing mulching jobs. Yet Call did not report any earnings after 2006. The ALJ, therefore, remarked that "there is no way to verify when the claimant actually stopped working." (R. at 24.)

Much of the record medical evidence dates to before the alleged onset date. Call was involved in an automobile accident in 2000 and claims he has suffered back and leg pain since then as a result of injuries sustained in the accident. He was released from the hospital with only contusions, however, and X rays and an MRI following the accident revealed nothing more than some degenerative disk disease. Call's pain was treated with pain medications and physical therapy. The

earlier medical records also note depression and anxiety. Susan Helton, LCSW, completed a medical assessment in September 2006 and assigned Call a global assessment of functioning ("GAF") score of 55.[2]

In November 2007, Call was still being treated by Gerard H. Murphy, M.D, for chronic back pain, sciatica, fibromyalgia, depression, and anxiety. Call's wife had died suddenly several months earlier, and he was caring for his two children, which he said left him with little time to himself. Call had been attending counseling at Heatherwood Counseling Center following the death of his wife, and he reported that the counseling was very helpful. He had been taking Lortab, which he found to be effective in managing his pain, and Celexa. Dr. Murphy also prescribed physical therapy and continued counseling.

In January 2008, Dr. Murphy indicated that Call had been on a chronic pain management program and "is able to function but is always in some pain;" lately, however, he had been unable to work due to pain. (R. at 365-66.) Dr. Murphy remarked that patients with fibromyalgia often feel worse after initial physical therapy sessions. On physical examination, Dr. Murphy noted some tenderness

---

[2] A GAF score indicates an individual's overall level of functioning at the time of examination. It is made up of two components: symptom severity and social occupational functioning. A GAF score ranging from 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning; a GAF score ranging from 51 to 60 denotes functioning with moderate symptoms or moderate difficulty in social, occupational, or school functioning; a GAF score ranging from 41 to 50 indicates functioning with serious symptoms or any serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000).

and pain to palpation in the lumbar spine, but "[e]xtension did not worsen his pain" and he had "a fairly normal gait." (R. at 365.) Dr. Murphy recommended continued physical therapy and pain medication, adding Lyrica to Call's medication regimen.

January 2008 records from Heartland Rehabilitation Services indicate that Call appeared motivated and his tolerance to treatment was good. On January 11, 2008, Call "state[d] that the treatments [were] really beginning to help" and he had decreased complaints of pain. (R. at 385.) On January 15, 2008, he "noted great relief with soft tissue work." (R. at 384.) By January 18, Call's point tenderness had improved from severe to minimal, and his "progress towards goals [was] excellent." (R. at 382.) However, on January 22, Call was very emotionally upset and chose not to perform the exercise program. The physical therapist advised him to seek help through a minister or counselor. It does not appear that Call ever returned to physical therapy after that date.

During an April 2008 visit, Dr. Murphy agreed to refill Call's pain medication prescription, but he "spent extensive time talking to Tony today about how the pain medicine is not the answer to most of his problems." (R. at 417.) Dr. Murphy opined that "[i]t probably helps his back and it can help the epicondylitis but most of his problems really stem from depression and anxiety and the recent loss he has had traumatically losing his wife to a burn injury." (*Id.*) By August

2008, Call reported that he had become very involved in his church, which "really motivated him to get out of the house some and do volunteer work." (R. at 416.) Dr. Murphy commented, "He is still bothered by his chronic back pain and sciatica symptoms but it seems like Tony is finally coming around to realizing that a lot of his physical complaints stem from his psychological turmoil." (*Id.*)

In November 2008, Call underwent a consultative examination with William Humphries, M.D., who diagnosed Call with multiple myalgias, chronic cervical and lumbar strain, and chronic elbow strain with probable chronic intermittent tendonitis. Dr. Humphries observed that Call was alert, pleasant, in no distress, answered questions appropriately, and related well to the examiner. On examination, he noted some mild tenderness in the cervical spine and lower lumbar regions, and a slightly reduced range of motion in the back. Straight leg raising elicited discomfort bilaterally at about eighty degrees in the sitting position. Call got onto and off of the examination table without difficulty. Dr. Humphries assessed that Call could sit six hours in an eight hour workday; stand and walk six hours in an eight hour workday; lift 25 pounds frequently and 50 pounds occasionally; climb, kneel, and crawl occasionally; but could not perform repetitive gripping, grasping, pushing, or pulling in a production setting with either hand.

Throughout the next year and a half, Call returned every few months to Dr. Murphy, who continued to prescribe pain and anti-depressant/anti-anxiety medications. In March 2009, Dr. Murphy reported that Call "has been able to get out, started working a little bit more doing some mulching jobs including fence rows." (R. at 450.) In September 2009, Dr. Murphy indicated that Call "is functioning pretty well, going to his children's events and being on top of things pretty well as a single dad." (R. at 488.)

In November 2009, Call presented to the emergency room for treatment of back pain and was diagnosed with mild lumbar spondylosis. He visited Dr. Murphy's office the next day and was seen by Rebecca Nash, FNP, who noted that Call was minimally tender and ambulated very carefully. She recommended rest and heat, along with adding Relafen to his existing medicine regimen.

In April 2010, Dr. Murphy noted Call "is still having a lot of pain and takes pain medicine as ordered 3x a day. He has still been unable to work due to a combination of his fibromyalgia and his panic and depression." (R. at 509.)

Call underwent mental health counseling at Heatherwood Counseling Center in November and December 2007. At his initial evaluation, his GAF score was assessed as 65. Counselor notes indicate that Call was depressed and tearful, and that he had difficulty sitting through his sessions due to his back pain. The diagnosis after the initial intake interview was "major depression single episode"

due to the death of his wife. (R. at 361.) In December 2007, the counselor noted that Call was doing well despite the pressure of his first holiday season without his wife.

In September 2010, at the suggestion of the ALJ, Call visited Pamela S. Tessnear, Ph.D., for a psychological evaluation. When Dr. Tessnear asked if there was any kind of work Call could do now, he replied that his children were his work and that caring for them was "[p]retty demanding." (R. at 514.) He also said he cooked, made minor home repairs, went shopping with his son, and took his daughter fishing three times last year. He did not like his children to ride the school bus because he felt there were too many germs, so he drove his children to and from school. Dr. Tessnear noted that Call was a bit defensive and guarded during the interview, but that his mood evened out during the testing and he portrayed good persistence. Dr. Tessnear diagnosed Call with major depressive disorder, recurrent, moderate and assigned a GAF score of 50. She noted, however that GAF "is best used to monitor change over time from the perspective of a single rater. Comparing different ratings made by different observers at different times may lead to inaccurate conclusions." (R. at 520.) Notably, Dr. Tessnear explained,

> Despite spending 5 hours with Mr. Call, I do not have as much confidence as I would like in my impressions of his psychological difficulties. His report is inconsistent at times and I have the sense that important information may be withheld. He says, for example,

> that he was unable to obtain a GED after multiple attempts but I can find no reason to account for this. He does not appear to be malingering but is defensive and does not share information easily.

(R. at 520-21.) As far as his prognosis, Dr. Tessnear opined, "If he were able to become engaged in psychotherapy, he would likely see some benefit." (R. at 521.) Dr. Tessnear's narrative functional assessment was as follows:

> Mr. Call is able to understand and follow simple and detailed instructions. He has little confidence in his abilities and requires encouragement when trying something new. His pace is slow and he will not have success in work that requires, for example, production or quotas. He is able to get along with supervisors and co-workers. He cannot work with the public in large numbers, such as in stores, because of anxiety. His concern about germs and contamination would prevent him from working in medical settings and could interfere with performance in food settings, where contamination would be a regular concern.

(*Id.*) Dr. Tessnear also completed a mental RFC questionnaire. Therein, she opined that Call was seriously limited, but not precluded, in his ability to carry out detailed instructions, deal with stress of semiskilled and skilled work, interact appropriately with the general public, and use public transportation. She further opined that he would miss about one day of work per month due to his impairments, which would be expected to last at least twelve months.

A week later, Call sought mental health treatment at Mount Rogers Community Services at the suggestion of his attorney. His appearance, behavior, speech, cognitive/intellectual functioning, thought processes, perceptions, thought content, child/adolescent history, suicidality, homicidality, and other safety

-9-

concerns were all unremarkable.  His affect/mood was sad and anxious, and he indicated he had trouble sleeping, decreased appetite, and low energy level.  He was reported to have good communications skills.  He was assessed as mildly impaired only in his ability to go shopping independently, to access community resources, to interact appropriately in social situations, and to develop/maintain a social support network.  He was assigned a GAF score of 62, and monthly counseling for a period of six months was recommended.

Several doctors assessed Call's RFC on behalf of the state agency.  Richard Surrusco, M.D., and Robert McGuffin, M.D., reviewed the record evidence in March and November 2008, respectively.  Both concluded that Call could lift ten pounds frequently and twenty pounds occasionally; could sit for six hours in an eight hour workday; could stand and walk for six hours in an eight hour workday; and could occasionally perform postural movements, but should never climb ladders, ropes, or scaffolds and was limited in reaching overhead.  Psychologists Louis Perrot, Ph.D., and Julie Jennings, Ph.D., reviewed the record evidence as of February and November 2008, respectively, and found no severe mental impairment.

At the hearing, the ALJ presented the VE with various hypotheticals reflecting the physical limitations stated in the state agency medical assessments and the mental limitations indicated in Dr. Tessnear's narrative functioning

assessment. The VE testified that an individual with these limitations could perform the jobs of bakery worker, shipping and receiving weigher, and produce sorter, all of which exist in significant numbers in the national economy.

In his decision, despite inconsistencies regarding Call's work history, the ALJ found that Call had not engaged in substantial gainful activity since the application date. The ALJ further found that Call had the severe impairments of degenerative disc disease/cervical and lumbar strain; multiple myalgias/ fibromyalgia; elbow strain with probable intermittent tendonitis; and major depressive disorder, recurrent, moderate; but that none of these impairments met or equaled a listed impairment. The ALJ determined that Call retained the RFC to perform light work with certain restrictions, including several representative jobs that existed in significant numbers in the national economy, and thus was not disabled under the Act.

Call argues that the ALJ erred by failing to afford proper weight to the opinion of Dr. Tessnear and by failing to properly consider Call's allegations of disabling pain. The Commissioner responds that the ALJ appropriately weighed Dr. Tessnear's opinion with the other evidence of record, and substantial evidence supported the ALJ's conclusion that Call's allegations regarding the limiting effects of his pain were not entirely credible. For the reasons stated below, I agree with the Commissioner on both counts.

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or medically equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2013). The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

I must review the denial of benefits under the Act to ensure that the ALJ's findings of fact "are supported by substantial evidence and [that] the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). I must not reweigh the evidence or make credibility determinations because those functions are left to the ALJ. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (alteration in original) (internal quotation marks and citation omitted).

Call contends that the ALJ failed to afford proper weight the opinion of examining source Dr. Tessnear. An ALJ is required to weigh medical opinions based on "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Id.,* at 654.

Here, Dr. Tessnear did examine Call and she is a specialist. On the other hand, she had no treating relationship with Call, and her assessment was inconsistent with other record evidence. The ALJ noted that while Dr. Tessnear

-13-

assigned a GAF score of 50, indicating a serious mental impairment, just one week later, Call's GAF was assessed as 62, indicating only mild impairment. Similarly, in late 2007, Call was assigned a GAF score of 65. Dr. Tessnear also expressed some doubt about the accuracy of her own conclusions, noting that Call was very fatigued during the evaluation, provided inconsistent accounts, and appeared to be withholding information. The ALJ further noted that he gave more weight to Dr. Tessnear's narrative description of limitations, which were supported by her evaluation notes, and gave only slight weight to the limitations in her checklist form, which were inconsistent with record as a whole. The ALJ thoroughly considered Dr. Tessnear's assessment and carefully weighed her opinions. As noted above, it is not my job to reweigh the evidence. Moreover, contrary to Call's assertion, the ALJ was not required to order another examination. The ALJ committed no error of law, and his conclusion as to Call's mental impairments is supported by substantial evidence.

Call also contends that the ALJ should have found him disabled due to severe pain. "[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). The ALJ must first determine whether the claimant suffers from a medical condition that could reasonably be expected to produce the alleged pain. *Id.*; 20 C.F.R. § 404.1529 (2013). If the ALJ finds that such a condition does exist, the

ALJ must next assess the intensity and persistence of the claimant's pain and the extent to which it affects the claimant's ability to work. *Craig*, 76 F.3d at 595; 20 C.F.R. § 404.1529. This second step takes into account all available evidence, including medical records, any objective evidence of pain, and evidence of the claimant's activities of daily living. *Craig*, 76 F.3d at 595.

The ALJ determined that Call's medically determinable impairments could reasonably be expected to produced the alleged pain. The ALJ further determined, however, that Call's statements concerning the intensity, persistence, and limiting effects of his pain were not entirely credible. The ALJ considered Call's reported activities of daily living, references in the record to attempts to work, and treatment notes indicating that he was functioning fairly well despite his impairments. Additionally, the ALJ noted that Call's course of treatment was relatively conservative, consisting primarily of pain medication and physical therapy, and that Call at times reported great relief from treatment. Moreover, there was minimal objective evidence that would support a finding of severe pain, and Dr. Murphy repeatedly indicated that most of Call's problems were due to his depression and anxiety. Indeed, Dr. Murphy stated several times that he believed returning to work would be beneficial for Call. The ALJ's credibility assessment is also understandable considering that Call's statements were replete with inconsistencies and contradicted by other evidence in the record. Thus, there is

ample evidence in the record to support the ALJ's conclusion that while Call experienced pain, his pain was not so severe as to preclude work.

IV

For the foregoing reasons, I find that the Commissioner's decision is supported by substantial evidence and complies with the applicable law. The plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

    DATED: August 5, 2013

    /s/ James P. Jones
    United States District Judge